U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2011 OCT -6  PM 3: 06

CLERK

BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

STEVEN DIMAGGIO,                    )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )   Case No. 5:10-cv-172
                                    )
MICHAEL J. ASTRUE, COMMISSIONER,    )
SOCIAL SECURITY ADMINISTRATION,     )
                                    )
        Defendant.                  )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION TO REVERSE AND GRANTING IN PART AND
DENYING IN PART DEFENDANT'S MOTION TO AFFIRM**
(Docs. 8, 12)

Plaintiff Steven DiMaggio is a claimant for Social Security Disability Insurance

Benefits ("DIB") and Supplemental Social Security Income ("SSI"). He brings this

action pursuant to 42 U.S.C. § 405(g) to reverse the Social Security Commissioner's

decision that he is not disabled, and to remand for a calculation of benefits. Plaintiff filed

his motion to reverse (Doc. 8) on February 2, 2011, and the Commissioner filed his

motion to affirm (Doc. 12) on May 5, 2011. Plaintiff is represented by Paula Jean Kane,

Esq., and the Commissioner is represented by AUSA Kevin J. Doyle.

**I.    Factual Background.**

Plaintiff is a forty-nine-year-old male who alleges disability as of June 1, 2006

resulting from arthritis in both feet, lateral epicondylitis (tennis elbow) in his left elbow,

carpal tunnel syndrome, difficulty reading, pain, and side-effects from pain medication,

including hypersomnolence (drowsiness).[1] He has a twelfth grade education and

_____

[1] In addition to the cited grounds, Plaintiff suffers from hypothyroidism, high blood pressure,
high cholesterol, high triglycerides, and acid reflux. As neither party claims these conditions
were erroneously excluded from a disability analysis, the court does not address them further.

previously worked as a construction worker, carpenter, automotive mechanic's assistant, and a laborer for drywall and wood chipping companies. He has also served in the Army National Guard.

### A. **Arthritic Feet.**

In November 2006, Plaintiff visited physician's assistant David Senese with a complaint of pain in his toes. Plaintiff reported that he had been laying tile at work, which required him to wear steel-toed shoes and put pressure on his toes while kneeling. He added that his feet stopped hurting when he changed into sneakers after work. PA Senese advised Plaintiff to get shoe inserts, wear socks with more cushioning, and take Ibuprofen for pain relief. He also advised Plaintiff to soak his feet after wearing boots.

In March 2007, Plaintiff saw his primary care physician Dr. Stewart Manchester, and podiatrist David Groening, D.P.M., for evaluation and treatment of continued pain in the forefoot area of both feet (with the left foot being worse than the right). Dr. Groening ordered x-rays that revealed bilateral hallux rigidus with degenerative changes. Upon examination, Dr. Manchester diagnosed mid-tarsal joint arthritis. Dr. Manchester prescribed Voltaren, to relieve symptoms of osteoarthritis. In April 2007, Plaintiff reported that the Voltaren was not helping, whereupon Tramadol was prescribed to treat his pain.

Plaintiff saw Dr. Groening for the second time in May 2007. Plaintiff stated that he was unable to stand on his feet for "any length of time." (AR 338.) Because multiple medications had not sufficiently relieved his symptoms, Plaintiff elected to undergo debridement of exostoses, a surgical procedure. Dr. Groening performed bilateral hallux debridement on May 15, 2007. Three days later, Plaintiff reported "only . . . some occasional pains in his foot." (AR 339.) As of May 23, 2007, Plaintiff was able to wear regular shoes and reported that his condition had improved following surgery.

On November 16, 2007, Plaintiff complained to Dr. Groening of continuing pain in his left foot. Dr. Groening prescribed Naprosyn for pain relief. Two weeks later, Plaintiff stated that he continued to have pain, but his condition had improved post-surgery. Dr. Groening explained that Plaintiff was experiencing "discomfort" that would

2

most likely remain chronic, and he recommended taking anti-inflammatory medications as the best course of treatment. Dr. Groening and Plaintiff also discussed the possibility of joint fusion surgery, and Dr. Groening noted that Plaintiff did "not want anything like th[at]." (AR 340.) Dr. Groening advised that surgery to fuse the joints would be indicated "if [Plaintiff's] pain should worsen to the point where he has difficulty walking." *Id.*

In December 2007 and January 2008, Plaintiff saw Dr. William Roberts at the Northwestern Medical Center Pain Clinic for treatment to reduce pain. Plaintiff told Dr. Roberts that surgery had not ameliorated his foot pain. In December 2007, Plaintiff reported a "pain score [of] 5/5 if he walk[ed] any distance." (AR 297.) Plaintiff stated that standing and walking aggravated his foot pain, and elevating his feet reduced pain. Upon exam, Plaintiff was able to heel and toe walk, and he ambulated without a limp. Dr. Roberts noted that "there is no evidence [that] [Plaintiff] [is] at all interested in avoiding work, and he would like to be employed as a carpenter, but understands that he is probably not able to do that." (AR 298.) Dr. Roberts opined that Plaintiff's condition would be best managed with mild opiates on an outpatient basis, and prescribed Lorcet, a trade name for hydrocodone. Dr. Roberts renewed Plaintiff's Lorcet prescription on October 30, 2008.

In January 2009, Dr. Roberts discontinued Plaintiff's Lorcet prescription for thirty days with the goal of increasing its efficacy. Plaintiff resumed Lorcet on February 9, 2009. During a follow-up visit on February 23, Dr. Roberts noted that, despite the tapering plan with his pain medication, Plaintiff "continue[d] to have a significant amount of pain." (AR 496.)

On March 19, 2009, Dr. Groening performed a second debridement of Plaintiff's left foot. Upon follow up with Dr. Groening on March 23, 2009, Plaintiff reported that he had been taking Percocet post-operatively "with good pain control." (AR 519.) Plaintiff continued to report decreased pain through May 2009. On May 30, 2009, Dr. Groening advised Plaintiff to "continue with activity as tolerated." (AR 520.)

Dr. Groening ordered additional x-rays of Plaintiff's left foot on October 29, 2009. Among other indications, these x-rays showed "marked degenerative changes" in the forefoot with "almost complete obliteration of the [metatarsophalangeal] joint space," consistent with hallux rigidus. (AR 527.)

Plaintiff returned to Dr. Groening on November 16, 2009. He complained of swelling and discomfort in the second toe of his left foot, which had been the focus of Dr. Groening's second debridement surgery. Dr. Groening noted that the area of Plaintiff's surgery was "well healed" with no edema. Plaintiff had no acute pain in his left foot. Dr. Groening explained to Plaintiff that the surgery was intended to improve his symptoms, but that his pain would likely continue on a chronic basis.

During his administrative hearing on February 1, 2010, Plaintiff testified that his feet hurt "all day long," and that the "pain spikes" when he puts pressure or weight on them. (AR 37.) He stated that standing, walking, and sitting upright aggravate his foot pain, while sitting with his legs elevated and stretched out reduces his pain. He further testified that, because of the pain in his feet, he is no longer able to do yard work, mow, plow, cook, or go grocery shopping unassisted. He also stated that he drives sparingly because pushing the clutch on his manual transmission vehicle causes pain. Plaintiff's wife, Melissa DiMaggio, testified that Plaintiff's feet render him unable to walk the dogs, walk with their children to the school bus stop, or perform household chores such as sweeping, mopping, vacuuming, and cleaning. "Once in a while he can walk and put laundry in the washing machine and then go back to his sitting position." (AR 56.)

### B.  Left Elbow Problems and Bilateral Carpal Tunnel Syndrome.

In November 2007, Plaintiff saw Dr. Manchester and reported left hand numbness. Dr. Manchester diagnosed left hand ulnar neuropathy. Dr. Manchester recommended conservative treatment, and, after a course of physical therapy, Plaintiff had increased strength in his left wrist and thumb but continued to experience pain during activity.

In February 2008, Plaintiff saw Dr. Steven Landfish of Synergy Orthopaedics for evaluation of left lateral epicondylitis, or "tennis elbow." Plaintiff reported pain over the lateral epicondyle with radiation downward along the common extensor. Upon exam,

4

Plaintiff was tender with extensor-type motions. He was not tender medially and was not complaining of any weakness, numbness, tingling, or decreased range of motion. Indeed, Plaintiff's left elbow demonstrated a full range of motion and full strength. Dr. Landfish provided Plaintiff with a steroid injection, and advised him to refrain from repetitive motion and lifting above fifteen pounds for the following three weeks.

On May 17, 2008, Plaintiff returned to Dr. Landfish for a follow-up visit. On this visit, Plaintiff additionally complained of left wrist and thumb pain. Upon exam, Plaintiff was less tender than on his prior visit, and demonstrated "good range of motion of his thumb." (AR 352.) Dr. Landfish ordered an MRI and EMG testing to determine whether there was "true degeneration" or a tear. *Id.* An MRI of the left elbow showed changes "consistent with lateral epicondylitis and tendinous injury." (AR 360.) Similarly, the EMG assessment revealed lateral epicondylitis and mild bilateral carpal tunnel syndrome. Dr. Landfish observed that Plaintiff's mild carpal tunnel syndrome "might account for some of [his] . . . numbness and tingling." (AR 358.)

On April 29, 2008, Plaintiff saw Philip Trabulsy, M.D. at Fletcher Allen Healthcare Orthopaedics and Rehabilitation Services for evaluation of his left elbow pain. Plaintiff reported that he was unable to work because of his foot pain, and that he was unable to use his left arm due to pain in his elbow and left thumb. Plaintiff reported occasional numbness and tingling and reported he wore a splint to perform manual activities. Upon examination, Plaintiff was in no distress, had 5/5 strength in both arms, intact sensation in both arms, and a full range of motion in his left elbow. Consistent with Plaintiff's MRI and EMG results, Dr. Trabulsy diagnosed chronic left lateral epicondylitis, bilateral carpal tunnel syndrome, and probable early joint osteoarthritis in the left thumb. He recommended another MRI of Plaintiff's left elbow and surgical consultation. He restricted Plaintiff to light work with no use of his left hand until a follow-up appointment.

Following Dr. Trabulsy's suggestion, Plaintiff met with Dr. Michel Benoit on June 26, 2008 to discuss surgical options. Dr. Benoit noted that Plaintiff continued to experience pain in his upper left extremity despite taking hydrocodone four times per

day. Upon examination, Plaintiff demonstrated a full range of motion of his left elbow, wrist and hand without evidence of weakness. Dr. Benoit concluded that Plaintiff's carpal tunnel syndrome did not warrant surgical intervention, but recommended surgery to treat Plaintiff's lateral epicondylitis. Plaintiff agreed, and Dr. Benoit performed a left lateral epicondylar debridement on July 1, 2008. Two weeks after surgery, Plaintiff was "doing fairly well." (AR 420.) He reported "some discomfort" and mild swelling around the surgical site, both of which Dr. Benoit "somewhat expected." *Id.* "Motion of [Plaintiff's] elbow was still uncomfortable at the extreme extension." *Id.* On August 21, 2008, Plaintiff was noted to be healing well from the surgery, and had a full range of motion in his left elbow. Dr. Benoit advised Plaintiff that his pain should gradually improve over the ensuing two months. Dr. Benoit encouraged Plaintiff to perform only those activities that were not painful for him. Plaintiff testified that he notices pain in his left arm "[a] good part of the day," even when he is "not doing things with [his] arms." (AR 41.)

### C. Vocational Training, Cognitive Limitations, and Hypersomnolence.

Plaintiff completed vocational training at the suggestion of Dr. Roberts, who concluded that Plaintiff would be unable to perform his prior work as a carpenter, and recommended vocational training to facilitate a career change. Plaintiff completed a welding course that was one evening per week, and ten keyboarding classes. Upon completion of the keyboarding class, Plaintiff was up to the letters "K" and "L," and could type fourteen words per minute. He testified that it "was pretty uncomfortable" for him to attend classes, and that he "normally paid for it" on the following day. (AR 45.)

In October 2008, Dr. Roberts noted that Plaintiff's welding class "was going well for him" and that Plaintiff was "enjoying his learning experiences[.]" (AR 500.) At that time, Dr. Roberts was "hopeful that [Plaintiff] will be able to find an environment in which he can do specialty welding with light me[t]als and [that] there are opportunities for that in the industry that would not require . . . him to spend a great deal of time on his feet." *Id.* In February 2009, Dr. Roberts noted that Plaintiff was learning welding and keyboarding skills, and "has had no difficulty with his academics." (AR 497.) Plaintiff

6

was expected to complete a welding course in two weeks, and to begin an automotive course thereafter. According to Dr. Groening's notes, Plaintiff was enrolled in an automotive class in November 2009.

Plaintiff reported that he is a slow reader and that he is "not very good at spelling." (AR 43.) He testified that he reads the sports section of the newspaper, but has problems reading "big words." *Id.* He further testified that he was unable to learn at the rate that his keyboarding class progressed. Plaintiff also reported hypersomnolence caused by his pain medication, and testified that he falls asleep after taking each dose. This testimony was corroborated by Plaintiff's wife, who testified that "taking his medication . . . usually puts him right back to sleep." (AR 57.)

### D. Medical Opinions and Functional Assessments.

On January 21, 2008, Dr. Groening wrote a letter to Vermont Disability Determination Services stating that Plaintiff had "discomfort in his feet" and "difficulty standing or walking for prolonged periods." (AR 334.)

In April 2008, non-examining Agency Physician Cynthia Short, M.D. completed a functional capacity assessment of Plaintiff. After reviewing Plaintiff's medical record, Dr. Short concluded that Plaintiff could lift and carry up to twenty pounds occasionally and up to ten pounds frequently, and that he could stand and/or walk for at least two hours in an eight-hour workday and sit for about six hours in an eight-hour workday. She further opined that Plaintiff was limited to occasional grasping and twisting with his left arm.

On January 29, 2010, treating physician, Dr. Manchester opined that Plaintiff was unable to work on a full-time basis because he could not stand or engage in prolonged sitting secondary to osteoarthritis. Dr. Manchester concluded that because Plaintiff needed to change positions frequently and to keep his feet elevated, he would need more than "ordinary" work breaks. He further opined that Plaintiff's hydrocodone, which he took four times per day, caused hypersomnolence and intermittent cognitive impairment lasting one to two hours. In Dr. Manchester's opinion, Plaintiff could not stand or walk, could never lift or carry any amount of weight, and was limited to sitting five minutes at a

7

time for a total of four hours in an eight-hour workday.  Finally, Dr. Manchester opined that Plaintiff could not push or pull, use his feet, or engage in postural activities.

## II.   **Procedural History.**

Plaintiff filed applications for DIB and SSI on December 12, 2007.  He alleged disability as of June 1, 2006.  His applications were denied initially and upon reconsideration.  Plaintiff timely requested review by an Administrative Law Judge ("ALJ"), and ALJ Dory Sutker convened a hearing on February 1, 2010.  On February 11, 2010, ALJ Sutker issued a written decision finding that Plaintiff is not disabled.  On May 17, 2010, the Decision Review Board affirmed the ALJ's decision, making it the final decision of the Commissioner.  Plaintiff timely filed the present action, and his claim is ripe for judicial review pursuant to 42 U.S.C. § 405(g).

## III.   **The ALJ's Application of the Five-Step Sequential Evaluation Process.**

In order to receive benefits, a claimant must be "disabled" on or before his or her "date last insured" under the Social Security Act.  42 U.S.C. § 423(a)(1)(A).  To determine whether a claimant is "disabled,"[2] the regulations require application of a five step sequential evaluation process.  *Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004); 20 C.F.R. §§ 404.1520; 416.920.  The answer to the inquiry at each step determines whether the next step's question must be answered.  Step one asks whether the claimant has engaged in substantial gainful activity since the alleged onset date of disability.  If not, step two asks whether the claimant has any "impairments" that are "severe."  If one or more "severe impairments" are found, step three asks whether any of these impairments meet or equal one of the listed impairments found in Appendix I of 20 C.F.R. § 404.1599 (the "Listings").  If an impairment meets or equals a listed impairment then the claimant is deemed "disabled."  If not, step four asks whether the claimant retains the Residual Functional Capacity ("RFC") to do his or her past relevant work.

---

[2] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Finally, if the claimant is unable to do prior relevant work, step five asks whether the claimant is able to do any job available in significant numbers in the national economy. *Id.* Through the first four steps, the claimant bears the burden of proving disability. At step five, that burden shifts to the Commissioner to show that there is other work in the national economy that the claimant can perform. *See Zabala v. Astrue*, 595 F.3d 402, 407 (2d Cir. 2010). In satisfying this burden, the Commissioner need not provide additional evidence of the claimant's RFC. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

In this case, the ALJ followed the sequential evaluation through all five steps. The ALJ found that Plaintiff has the severe impairments of hallux rigidus (in his feet), epicondylitis (in his left elbow), and carpal tunnel syndrome (in his left wrist). The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equals one of the Listings. The ALJ then found that Plaintiff has the RFC "to perform light work as defined in 20 C.F.R. § 404.1567(a) . . . except he is limited to brief periods of standing and walking of a few minutes at a time."[3] (AR 18.) The ALJ found Plaintiff was restricted "from crawling and climbing ladders, ropes, or scaffolds," and was further limited "to simple, routine, and repetitive tasks" in "an environment that allows for his legs to remain outstretched." (AR 19.) The ALJ found that Plaintiff could perform fine manipulation on a frequent, but not constant, basis. Based on this RFC determination, the ALJ concluded that Plaintiff could not perform any of his prior relevant work. At step-five, the ALJ relied on the testimony of the vocational expert to conclude that Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and is therefore "not disabled." (AR 23.) Specifically, the ALJ found that Plaintiff has the RFC to work as a telemarketer and a gate guard, as those positions were described by the vocational expert.

---

[3] 20 C.F.R. § 404.1567(a) actually defines "sedentary work," not "light work." This error is not material, however, because the ALJ explicitly limited Plaintiff's ability to stand and walk to below the light-level. *See id.* ("a job is in [the light] category when it requires a good deal of walking or standing").

**IV.**   **Standard of Review**.

In reviewing the Commissioner's decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002); *see also* 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if a court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g). It is the Commissioner that resolves evidentiary conflicts and determines credibility issues, and the court may not substitute its own judgment for the Commissioner's. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Aponte v. Secretary of HHS*, 728 F.2d 588, 591 (2d Cir. 1984). However, if the "evidence has not been properly evaluated because of an erroneous view of the law . . . the determination of the [Commissioner] will not be upheld." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

**V.**   **Conclusions of Law and Analysis**.

Plaintiff argues that the ALJ's decision must be reversed because it misapplies the relevant legal standards and is not supported by substantial evidence. In particular, he argues that (1) the ALJ failed to properly assess Plaintiff's credibility in discounting his subjective complaints of pain; (2) the ALJ gave insufficient weight to the opinion of Dr. Manchester, Plaintiff's primary care physician and too great of weight to agency non-examining Dr. Short's opinions; (3) the ALJ failed to consider the combined effects of Plaintiff's impairments; (4) the ALJ's RFC determination is not supported by substantial evidence; and (5) the ALJ improperly relied upon the testimony provided by the vocational expert. The Commissioner disputes all of these contentions, and argues that the ALJ's decision should be affirmed.

10

## A. __The ALJ's Credibility Assessment__.

In explaining her RFC determination, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (AR 20.)  Plaintiff argues that this assessment cannot be affirmed because it was the product of legal error, and because it is not based upon substantial evidence.  In particular, Plaintiff contends that the ALJ mischaracterized the record, and that her evaluation of the evidence was unreasonable because she over-emphasized Plaintiff's vocational coursework and periods during which Plaintiff's symptoms improved.

In assessing credibility, the ALJ considers several enumerated factors in addition to the objective medical evidence, including: the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain; precipitating and aggravating factors; the type, dosage, and effectiveness of any medications taken to alleviate pain; and any treatment provided to reduce pain.  *See* 20 C.F.R. § 404.1529(c)(3)(i)-(v).

"Under appropriate circumstances, the subjective experience of pain can support a finding of disability." *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999).  "A claimant who alleges disability based on the subjective experience of pain need not adduce direct medical evidence confirming the extent of the pain, but the applicable regulations do require 'medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain.'" *Id.* at 135 (quoting 20 C.F.R. § 404.1529(a)); *see also* 42 U.S.C. § 423(d)(5).  Once a claimant has demonstrated the existence of such an impairment, the question becomes whether the claimant's subjective allegations regarding the extent of his pain and other symptoms are credible. *See id.*

If the ALJ "decides to reject subjective testimony concerning pain and other symptoms, he must do so explicitly and with sufficient specificity to enable the [c]ourt to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence." *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (citations omitted).  "Normally, [the court] give[s] an ALJ's

credibility determinations special deference because the ALJ is in the best position to see and hear the witness. But it is nevertheless possible to upset a credibility finding if, after examining the ALJ's reasons for discrediting testimony, [her] . . . finding is patently wrong." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (internal citations omitted).

In this case, the ALJ found that Plaintiff's severe impairments of hallux rigidus, epicondylitis, and carpal tunnel syndrome could reasonably be expected to cause Plaintiff's alleged symptoms. She, however, discounted Plaintiff's subjective complaints regarding the severity of his symptoms to the extent they were inconsistent with the non-examining agency physician's RFC determination. In other words, the ALJ did not reject Plaintiff's testimony in its entirety. Instead, she found only that Plaintiff's allegations of pain and other symptoms were not credible to the extent that they suggested functional limitations greater than those set forth in the RFC assessment.

In assessing Plaintiff's credibility, the ALJ listed and applied the relevant factors set forth in 20 C.F.R. § 404.1529. *See* AR 19-21. In addition to the objective medical record, she relied on Plaintiff's successful completion of vocational courses, the results of his surgical treatment and pain medication, his ability to alleviate pain by wearing cushioned shoes and stretching his legs to relieve pressure, and the inconsistency between his hearing testimony and his subjective complaints to treatment providers. *See* SSR 96-7p, 1996 WL 374186 (July 2, 1996) ("[o]ne strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the case record"). In applying these factors, the ALJ did not materially mischaracterize the record and did not wrongfully imply "that all the plaintiff had to do was change his shoes and he would have no pain and be able to work." (Doc. 16 at 3.) To the contrary, the ALJ's RFC assessment explicitly limits Plaintiff to brief periods of standing and walking for only a "few minutes at a time," and mandates a work environment that permits Plaintiff to keep his legs outstretched.[4] (AR 18-19.)

---

[4] Similarly, Plaintiff argues that the ALJ improperly inferred from his decision to forgo joint fusion surgery "that therefore [Plaintiff] could walk with no problem and did not have the level of pain of which he complained." (Doc. 16 at 5.) In assessing Plaintiff's credibility, the ALJ did

In large part, Plaintiff's challenge to the ALJ's credibility determination question the probative value of certain evidence, and ask the court to impermissibly interfere with the ALJ's role as fact-finder. Specifically, Plaintiff argues that the ALJ assigned undue weight to Plaintiff's participation in vocational courses and portions of the medical record that indicate improvement and decreased pain.

For example, the ALJ found that Plaintiff's successful completion of the keyboarding and welding classes, along with his participation in an automotive class, were inconsistent with his allegations of complete disability. Plaintiff argues that such reasoning is flawed because Plaintiff testified that he was "uncomfortable" during his classes and "normally paid for it the next day." (AR 45.) In addition, Plaintiff testified that although he completed the keyboarding course, he had difficulty keeping pace with the class, and only advanced through the letters "K" and "L." (AR 46.) Notes from treatment providers regarding Plaintiff's vocational training, however, are inconsistent with such difficulties. For example, Dr. Roberts observed that Plaintiff's welding course "was going well," and that Plaintiff was "enjoying his learning experiences." (AR 500.) Later, Dr. Roberts noted that Plaintiff "has had no difficulty with his academics and he is completing a computer course now, a welding course in two weeks, and beginning an automotive course thereafter." (AR 497.) Such inconsistencies between Plaintiff's testimony and the medical record are strictly for the ALJ to resolve, and her assessment cannot be second-guessed on judicial review. *See Aponte*, 728 F.2d at 591 ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."). Moreover, Plaintiff's vocational coursework was only one piece of relevant evidence on which the ALJ relied to assess Plaintiff's credibility, and therefore need not constitute "substantial evidence" standing alone.

---

mention that, according to Dr. Groening, joint fusion would be indicated if Plaintiff's pain resulted in difficulty walking, and that Plaintiff "has not had that surgery." (AR 21.) But the ALJ's RFC determination establishes that she did not infer from this that Plaintiff can "walk with no problem."

Plaintiff also questions the ALJ's assessment of the medical record.  Upon review of the record, the ALJ observed that Plaintiff's symptoms improved after surgery, his pain was "well controlled" with Lorcet, he and his providers repeatedly reported "discomfort" rather than disabling pain, he was able to relieve pain by stretching and elevating his legs, he retained full motion in his elbow, wrist, and hand, and he was able to heel and toe walk and ambulate over short distances without a limp.  (AR 20-21.) Based on this evidence, along with Plaintiff's activities, the ALJ concluded that "[a]lthough the claimant does experience pain and limitation, the record cuts against the strength of his allegations and runs counter to a finding of disability."  (AR 21.)

Again, Plaintiff provides several reasons why the *weight* the ALJ attributed to this evidence is in error.  For example, Plaintiff states that the ALJ afforded too much weight to the fact that Plaintiff's "pain was well controlled" by Lorcet in 2008 because he had only been taking Lorcet for about a month at that time, and the medication lost some efficacy by 2009.  (Doc. 16 at 6.)  In addition, Plaintiff contends that his improved condition following surgery is best explained by the medications that he was prescribed post-operatively, as opposed to the success of the surgery itself.  Plaintiff also claims that Dr. Groening's use of the term "discomfort" is synonymous with "pain," and should be not be read to indicate improved or non-severe symptoms.  The question before the court, however, is only whether there is substantial evidence to support the ALJ's credibility finding.  *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) ("The ALJ's credibility determinations are entitled to special deference . . . [a]ccordingly, [courts] reverse credibility determinations only if they are patently wrong."). If the "court finds substantial evidence to support the Commissioner's . . . decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." *Fitzgerald v. Astrue*, 2009 WL 4571762, at *4 (D. Vt. Nov. 30, 2009) (citing *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)).  Here, the court cannot conclude that no reasonable fact finder would reach the same conclusion as to Plaintiff's credibility as the ALJ did in this case, and because it is supported by substantial evidence, the ALJ's

credibility determination must be affirmed. *See Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir. 1994).

With regard to the ALJ's credibility determination, Plaintiff's motion is DENIED and the Commissioner's motion is GRANTED.

**B.  The ALJ's Assessment of the Opinion Evidence.**

Plaintiff next argues that the ALJ erred in assigning "little weight" to the opinion of Dr. Manchester, one of Plaintiff's treating physicians, and in assigning "great weight" to the opinion of Dr. Short, a state agency physician who did not examine Plaintiff. Plaintiff contends that, under the "treating physician rule," Dr. Manchester's opinion should have been afforded controlling weight, and that the ALJ provided inadequate reasons for rejecting Dr. Manchester's opinion. As explained below, the ALJ properly declined to adopt Dr. Manchester's opinion with regard to the limiting effects of Plaintiff's hallux rigidus, epicondylitis, carpal tunnel syndrome, and pain.

Under the treating physician rule, a treating physician's opinion on the nature and severity of a claimant's condition is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 567-69 (2d Cir. 1993). Notwithstanding this rule, "when other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling," *Snell*, 177 F.3d at 133, and it may be appropriate to give greater weight to the opinion of a nonexamining physician. *See* 20 C.F.R. § 404.1527(f); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). When a treating physician's opinion is not afforded controlling weight, the ALJ must provide "good reasons" for discounting it. 20 C.F.R. § 416.927(d)(2); *see also Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

In this case, the ALJ cited "good reasons" for giving "little weight" to Dr. Manchester's opinions regarding the severity of Plaintiff's pain and physical

impairments,[5] including his hallux rigidus, epicondylitis, and bilateral carpal tunnel syndrome. *See Absalon v. Comm'r of Social Sec.*, 2009 WL 1035118, at *6 (N.D.N.Y. Apr. 17, 2009) (distinguishing between treating physician's opinion as to the plaintiff's "*physical* limitations," and the opinion that the plaintiff's "medication side effects prevented her from maintaining employment"). With regard to Dr. Manchester's opinion that Plaintiff could "never" lift or carry any amount of weight, and "never" use his hands or feet for any activity, the ALJ concluded that it was "contradicted by [Plaintiff's] testimony that he helps out with the laundry and with his participation in welding and computer courses." (AR 21.)

Moreover, contrary to Plaintiff's assertion that the ALJ "outright" rejected the other functional limitations listed in Dr. Manchester's opinion, the ALJ actually considered them in her RFC determination, which incorporated some of the functional limitations advocated by Dr. Manchester. For example, consistent with Dr. Manchester's opinion, the ALJ found that Plaintiff required a work environment that permitted his legs to remain outstretched, could stand or walk for only brief periods lasting a few minutes, and was limited to simple, repetitive, and routine tasks.

Finally, even if the ALJ erred in not providing further explanation regarding the probative value assigned to Dr. Manchester's opinion, such error was harmless. A failure to explain the rejection of a treating physician's opinion is harmless if the court can assure itself through a review of the record that "the substance of the treating physician rule was not traversed." *Halloran*, 362 F.3d at 32. Therefore, even in the absence of a detailed explanation, remand is not warranted if "the ALJ considered and rejected [the opinion] for reasons that are appropriate under the regulations and evident from the

---

[5] The treating physician rule applies only to opinions regarding the nature and severity of impairments, and the question of whether Plaintiff can work on a full-time basis—i.e., whether Plaintiff is disabled—is reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e). Therefore, Dr. Manchester's opinion that Plaintiff is unable to work full-time was not entitled to any special deference. *See Gladden v. Comm'r of Social Sec.*, 2009 WL 2171400, at **2 (2d Cir. July 22, 2009) ("whether a physician believes an applicant is 'disabled' is irrelevant, since this determination is reserved to the Commissioner").

record and the ALJ's findings." *Klodzinski v. Astrue*, 274 Fed. App'x. 72, 74 (2d Cir. 2008). For the following reasons, that approach is warranted in this case.

First, Dr. Manchester's opinion is inconsistent with the opinions of Plaintiff's other examining physicians. In an opinion afforded "great weight" by the ALJ, Dr. Groening opined that Plaintiff has "difficulty standing or walking for prolonged periods," (AR 334), but had not reached the point where he could no longer walk. *See* AR 340. Dr. Groening subsequently suggested to Plaintiff "that jobs at which he is able to sit would probably be best for him." *See* AR 521. Similarly, although Plaintiff complained of an inability to work because of foot pain, Dr. Trabulsy restricted Plaintiff to "light work" with no use of his left hand until a follow-up appointment. (AR 400.) Finally, Dr. Roberts believed that Plaintiff's arthritic feet could be "managed best with mild oral opiates on an outpatient basis," (AR 298), and he expressed "hope" that Plaintiff could find welding work that "would not require . . . him to spend a great deal of time on his feet." (AR 500.) Each of these opinions is inconsistent with Dr. Manchester's view that Plaintiff could never stand or walk, and could not even sit for more than five uninterrupted minutes (and for not more than a total of four hours per eight-hour workday).

Second, Dr. Manchester's opinion is inconsistent with other substantial evidence in the medical record, as discussed by the ALJ in her credibility analysis. As set forth above, such evidence includes Plaintiff's improved condition following surgery on his feet and left elbow, his successful participation in vocational courses, and his periods of positive response to pain medications.

In sum, with regard to Plaintiff's pain and physical impairments, "the substance of the treating physician rule was not traversed" in this case. *Halloran*, 362 F.3d at 32. The ALJ did not "arbitrarily substitute [her] own judgment for competent medical opinion," *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); rather, she provided "good reasons" why she rejected certain aspects of Dr. Manchester's opinion. Accordingly, it was not

reversible error to assign "little weight" to Dr. Manchester's opinions regarding the severity of Plaintiff's physical impairments.[6]

Likewise, it was not reversible error for the ALJ to afford "great weight" to the April 2008 opinion of state agency physician Dr. Short. The ALJ did not "adopt all of Dr. Short's RFC findings" as Plaintiff claims, but instead rejected Dr. Short's opinion that Plaintiff could stand and/or walk for at least two hours in an eight-hour workday, and could sit for about six hours in an eight-hour workday. The ALJ determined that Plaintiff could stand or walk for only a few minutes at a time, and further restricted Plaintiff's ability to sit by requiring a workspace in which his legs could remain outstretched. The ALJ was free "to piece together the relevant medical facts from the findings and opinions of multiple physicians," *Evangelista v. Sec'y of Health and Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987), and her consideration of Dr. Short's opinion was not error.

With regard to Plaintiff's challenges to these aspects of the ALJ's analysis of the opinion evidence, Plaintiff's motion is DENIED and the Commissioner's motion is GRANTED.

A different result, however, is mandated with regard to Dr. Manchester's opinion that Plaintiff suffers from "hypersomnolence" and "intermittent cognitive impairment" as two side-effects of hydrocodone. Dr. Manchester further opined that such side-effects persist for one to two hours after each dose of medication (which Plaintiff takes four

---

[6] In his Motion to Reverse, Plaintiff suggests that the ALJ erred in not further developing the record or re-contacting Dr. Manchester for clarification of his opinion. He argues that, "[i]f an administrative law judge perceives inconsistencies in a treating physician's reports, the administrative law judge bears the affirmative duty to seek out more information from the treating physician and to develop the record accordingly[.]" (Doc. 8 at 19) (citing *Rosa*, 168 F.3d at 79). The ALJ's affirmative duty to further develop the record exists when there is insufficient evidence to render an informed decision, i.e., when there are "clear gaps in the administrative record." *Rosa*, 168 F.3d at 79; *see also* 20 C.F.R. § 404.1512(d) ("[w]hen the evidence we receive from your treating physician . . . is inadequate for us to determine whether you are disabled, . . . [w]e will first re-contact your treating physician . . . to determine whether the additional information we need is readily available.") In this case, the ALJ had before her a complete medical record, as well as opinions from two treating physicians and a state agency physician. Dr. Manchester's medical source statement did not contain internal inconsistencies that might warrant clarification. *Cf. Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998). As a result, the ALJ had no duty to re-contact Dr. Manchester to further develop the record.

times per day), and are severe enough to "affect [Plaintiff's] ability to perform job related activities[.]" (AR 545.) Although the ALJ arguably incorporated Plaintiff's intermittent cognitive impairment into Plaintiff's RFC by restricting him to "simple, routine, and repetitive tasks," she made no mention of Plaintiff's inability to stay awake after taking pain medication other than to note Dr. Manchester's opinion included an opinion "that side effects from medication would affect [Plaintiff's] ability to perform job related activities." (AR 21).

The ALJ's exclusion of Plaintiff's hypersomnolence from her RFC assessment was error. Neither the opinions of Plaintiff's other treating physicians, nor the objective medical record, are inconsistent with Dr. Manchester's opinion regarding Plaintiff's hypersomnolence. In fact, Dr. Manchester has solely managed Plaintiff's pain medications since March 2009. Therefore, this aspect of Dr. Manchester's opinion was entitled to "controlling weight" pursuant to the treating physician rule unless there are "good reasons" to reject it. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("[w]hile an [ALJ] is free to . . . choose between properly submitted medical opinions, [she] is not free to set [her] own expertise against that of a physician who [submitted an opinion to] or testified before [her.]") (internal quotation marks omitted). The ALJ thus erred in not explaining why she concluded that Dr. Manchester's opinion is inconsistent with other substantial evidence in the record. Unlike Dr. Manchester's opinion with respect to Plaintiff's other impairments, it is not apparent from the record that Dr. Manchester's opinion concerning Plaintiff's hypersomnolence was rejected for appropriate reasons. *See Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Accordingly, because the ALJ did not properly assess the opinion of Plaintiff's treating physician, with regard to Plaintiff's cognitive impairments, her RFC assessment must also be reexamined. *See Slocum v. Astrue*, 2011 WL 1792581, at *8 (D.

Vt. 2011) (remanding for proper consideration of opinion evidence and reassessment of the plaintiff's RFC).

With regard to Plaintiff's challenge to the ALJ's evaluation of his treating physician's opinion of his hypersomnolence and the ALJ's RFC assessment which also omitted this opinion evidence, Plaintiff's motion is GRANTED and the Commissioner's Motion is DENIED.

### C. Considering the Combined Effects of Plaintiff's Impairments.

Plaintiff argues that the ALJ failed to consider the effects of his several impairments in combination. In particular, Plaintiff argues that the ALJ failed to consider the limiting effects of his bilateral carpal tunnel syndrome and his epicondylitis, and failed to include pain and medication side-effects, including drowsiness, as impairments.

Because it is true that "all complaints . . . must be considered together in determining . . . work capacity," *De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 937 (2d Cir. 1984) (internal quotation marks omitted), and because the ALJ erred in not properly considering Plaintiff's hypersomnolence, the court remands so that the ALJ may fulfill her duty to consider Plaintiff's impairments in combination.

With regard to the ALJ's consideration of the combined effects of Plaintiff's impairments, Plaintiff's motion is GRANTED and the Commissioner's Motion is DENIED.

### VI.   Order.

For the foregoing reasons, Plaintiff's motion to reverse (Doc. 8) is GRANTED IN PART AND DENIED IN PART, and the Commissioner's motion to affirm (Doc. 12) is GRANTED IN PART AND DENIED IN PART. Plaintiff's claim for DIB and SSI must be remanded, pursuant to "sentence four" of 42 U.S.C. § 405(g)[7], for a new hearing consistent with this Order. Because the court remands for a re-evaluation of Plaintiff's

---

[7] Under sentence four of 42 U.S.C. § 405(g), the district court has the authority to reverse, modify, or affirm the decision of the Commissioner. This may include a remand of the case back to the Commissioner for further analysis and a new decision. *See generally Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir.1999). A sentence four remand is a final judgment. *See Melkonyan v. Sullivan,* 501 U.S. 89, 97–102 (1991); Fed. R. Civ. P. 58.

RFC, it expresses no opinion as to whether the ALJ properly relied on the vocational expert's testimony at step five of the sequential evaluation. Both the hypothetical posed to the vocational expert and the vocational expert's subsequent testimony were based on the ALJ's original RFC assessment.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this ____ day of October, 2011.

Christina Reiss, Chief Judge
United States District Court